**CYTOSOL LABORATORIES, INC.,**
**Plaintiff and Counterclaim–**
**Defendant,**

v.

**FEDERAL INSURANCE COMPANY,**
**Defendant and Counterclaim–**
**Plaintiff.**

**Civil Action No. 06–12129–JLT.**

United States District Court,
D. Massachusetts.

March 6, 2008.

evidence of record that the condition precedent—a demand—has been met.

Erin E. McLaughlin, Nancy B. Reiner, Brown Rudnick Berlack Israels LLP, Boston, MA, for Plaintiff and Counterclaim–Defendant.

William A. Schneider, Morrison Mahoney LLP, Boston, MA, for Defendant.

Paul W. Shaw, Brown Rudnick Berlack Israels LLP Boston, MA, for Counterclaim–Plaintiff.

## MEMORANDUM

JOSEPH L. TAURO, District Judge.

Plaintiff Cytosol Laboratories, Inc. ("Cytosol") seeks a declaratory judgment that certain claims made against it by Advance Medical Optics, Inc. ("AMO"), are covered under insurance policies issued by Defendant Federal Insurance Company ("Federal"). In turn, Federal seeks a declaratory judgment that the policies provide no coverage, and that Federal has no duty to indemnify or defend in this matter. Cytosol also seeks recovery under Massachusetts General Laws chapter 93A, alleging that Federal's denial of coverage constituted an unfair or deceptive trade act. Presently at issue are the Parties' cross-motions for summary judgment.[1] For the following reasons, Federal's motion is ALLOWED except as to costs and attorneys fees, and Cytosol's motion is DENIED.

### Factual Background[2]

#### A. Relevant Entities

Cytosol Laboratories is a life sciences pharmaceutical manufacturer registered in Massachusetts, with a principal place of business in Braintree, Massachusetts.[3] Cytosol Opthalmics, Inc. ("Cytosol Opthalmics") is a North Carolina corporation that sells medical products for use during opthalmic surgery, with a principal place

---

1. Cytosol's *Motion for Summary Judgment* [# 17] ("Pl. Mot. for Summ. J."); Federal's *Motion for Summary Judgment* [# 22] ("Def. Mot. for Summ. J.").

2. These facts are presented in the light most favorable to the Plaintiff, the party who does not prevail on summary judgment. *See Alliance of Auto. Mfrs. v. Gwadosky,* 430 F.3d 30, 34 (1st Cir.2005) ("like the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof.")

3. *See* Pl.'s Local Rule 56.1 Statement at 1 [# 26] ("Pl.Facts"); Def.'s Local Rule 56.1 Statement at 1 [# 24] ("Def.Facts").

of business in Lenoir, North Carolina.[4] Advanced Medical Optics, Inc. ("AMO") is a California corporation that sells and distributes ophthalmic products to the medical community, with a principal place of business in Santa Ana, California.[5]

## B. Cytosol's Insurance Coverage

For purposes of summary judgment, during the relevant time period, Cytosol was covered under three main insurance policies from Federal.[6] Under the Customarq Series Life Sciences Insurance Program, Cytosol had coverage under two policies: (1) a claims-made Products/Completed Operations Liability Policy ("Products Policy");[7] and (2) a General Liability Policy.[8] Cytosol also had a(3) Forefront Portfolio Directors & Officers Liability Policy ("D & O Policy"), which had a "Corporate Liability Coverage Section" with an aggregate cap of $1,000,000.[9] Lastly, as a supplement to the Products Policy and General Liability Policy, Cytosol purchased additional Products Withdrawal and Crisis Management Insurance.[10]

## C. Endosol

In June of 2004, AMO contracted with Cytosol Opthalmics to manufacture and supply AMO with Endosol Balanced Salt Solution,[11] a solution used to irrigate patients' eyes, nose, and throat during a variety of procedures including cataract surgery.[12] Cytosol Opthalmics outsourced the manufacture of Endosol to Cytosol Laboratories.[13] Cytosol Laboratories manufactured, bottled, sealed and packaged the Endosol product in boxes with AMO's label, and then shipped it to AMO.[14] AMO then sold the product as "AMO Endosol."[15]

On November 10, 2005, AMO issued a "Medical Device Safety Alert" ("Alert") regarding "AMO Endosol Products" to all of its customers.[16] The Alert indicated:

AMO has received reports that some physicians using the AMO Endosol products have observed a Toxic Anterior Segment Syndrome (TASS) response in their patients following surgery. TASS results when a contaminant (noninfectious toxic agent) enters the anterior segment during surgery and causes an inflammatory reaction.[17]

The Alert further stated, "[W]e believe it is in the best interest of physicians and patients to *STOP THE USE OF ALL AMO ENDOSOL LOTS MANUFAC-*

---

4. *See* Pl. Facts at 1; Joint Appendix ("JA") Ex. 4 at 226A [# 18–7].

5. *See id.*

6. Cytosol notes that it was also covered under a fourth policy, Policy No. 3578–7183, but does not seek coverage under this policy for purposes of summary judgment. *See* Pl. Mem. in Support of Pl.'s Mot. for Summ. J. at 2 n. 2 [# 19] ("Pl.Mem.").

7. Policy No. 33582–68–80, JA Ex. 2 [# 18–4–5].

8. Policy No. 3578–71–83, JA Ex. 1 [# 18–2–3].

9. Policy No. 8169–0527, JA Ex. 3 [# 18–6].

10. Def. Facts at 9–10. This additional insurance was provided pursuant to Endorsement Form 80–02–6247 to the Products Policy and General Liability Policy. *Id.* at 9.

11. *See* Pl. Facts at 2; JA Ex. 4 [# 18–6]; Def. Facts at 2.

12. Amended Compl. at 3 [# 1–1].

13. *See* Pl. Facts at 2.

14. *See id.*

15. *See id.*

16. JA Ex. 5 [# 18–8].

17. *Id.*

*TURED BY CYTOSOL LABORATO-RIES, INC.* until further notice." [18]

On November 18, 2005, in an "Urgent Medical Device Recall," AMO recalled all Endosol manufactured by Cytosol based on the same TASS and inflammation issue. [19]

On December 13, 2005, Mark Broadley ("Broadley"), Cytosol's Vice President and General Manager, wrote the Chubb Group of Insurance Companies ("Chubb"), Federal's parent company, alerting Chubb of the recall. [20]

Several days after Cytosol sent the letter, Jill Boon ("Boon"), a Senior Litigation Examiner for Federal, followed up with a phone call to Broadley (Cytosol). [21] Boon requested that Broadley "keep her posted" of any developments. [22]

On February 10, 2006, the United States Food & Drug Administration ("FDA") issued a "FDA Requested Recall" notice to Cytosol. [23] In part, the letter stated:

> This letter is to request that you immediately initiate a recall of Balanced Salt Solution (BSS), in all size containers and labels, manufactured by your firm in Braintree, MA, including initiating a request to your distributors to conduct sub-recalls to the user level of physician and hospitals. A November–December 2005 FDA inspection revealed that the manufacturing and testing controls for your BSS products are inadequate to prevent elevated endotoxin levels. The

presence of endotoxins in elevated levels in these products can represent a serious hazard to health. [24]

On February 14, 2006, Cytosol initiated a voluntary recall for all lot numbers of the Balanced Salt Solution manufactured in its Braintree facility. [25]

On February 15, 2006, Broadley (Cytosol) sent Chubb written notice of its voluntary recall, stating, "We are providing this notification pursuant to the terms of the above referenced [Chubb liability] policy for any potential claims that may arise from the recall." [26]

On April 26, 2006, Janet Richardson, Corporate Counsel for AMO, wrote a letter to John Serio of the law firm Brown Rudnick, counsel for Cytosol Opthalmics and Cytosol Laboratories. [27] In the letter, AMO stated that "[t]here can be no doubt that the Product supplied by Cytosol failed to conform to the warranties set forth in Agreement Section 7. 1, thereby placing Cytosol in breach of the Agreement." [28] The letter continued:

> Specifically, the Product contained endotoxins (also known as pyrogens) at dangerously high levels, causing Toxic Anterior Segment Syndrome (TASS) and other inflammatory reactions in hundreds of cataract surgery patients. [29]

AMO demanded $661,913.66 in damages from Cytosol as a result of the allegedly

---

18. *Id.* (underlining and capitals in original, bold removed).

19. *See* JA Ex. 7 [# 18–10].

20. *See* JA Ex. 8 [# 18–11].

21. *See* Pl. Mem. at 4.

22. *See id.*

23. JA Ex. 9 [# 18–12].

24. *Id.*

25. *See* JA Ex. 10 [# 18–13].

26. *See id.*

27. Brown Rudnick represented both entities. *See* JA Ex. 12 [# 18–15].

28. *See* JA Ex. 12 at 264.

29. *Id.*

contaminated Endosol.[30] The "Damages to AMO from Cytosol's Breach of Contract and Warranties" section listed the damages as follows:

- Costs associated with effectuating and managing the recall of the Endosol product from its customers: $102,295.19

- Unsaleable inventory on hand at the time of the recall: $250,000

- Product returned by customers pursuant to the recall: $191,547.27

- Costs of cover: $118,071.00 [31]

AMO also asserted it paid an additional $97,384.89 in indemnification and associated costs for third-party customer claims against AMO, and requested that Cytosol reimburse AMO for these monies.[32]

On May 5, 2006, Paul Shaw ("Shaw") of Brown Rudnick wrote a letter to Chubb—addressed generally "To whom it may concern:"—regarding AMO's demand letter, and requested that Boon (Federal) "attempt to resolve these claims without AMO filing suit." [33]

On or about June 12, 2006, Boon (Federal) informed Shaw (Cytosol) that Federal's initial determination was that AMO's claims were not covered by Cytosol's policies.[34]

In response, on June 12, 2006, Shaw (Cytosol) sent Boon (Federal) a letter disagreeing with the initial determination, and specifying a certain provision that counsel believed provided coverage.[35]

On June 22, 2006, Federal formally denied all coverage in an eight-page letter (with an eleven-page appendix of definitions) from Boon (Federal) to Broadley (Cytosol).[36] Boon stated:

We have reviewed the letter and request for damages and the policies of insurance issued to Cytosol and must advise that Federal Insurance Company fails to see any coverage under either referenced policy of insurance for these claims. Our reasons for this position will be more clearly outlined in the following paragraphs.[37]

The letter then explained in detail why the two liability policies did not cover the damages claimed by AMO.[38]

On August 11, 2006, Cytosol filed suit against Chubb and Federal in Massachusetts Superior Court.[39] Cytosol did not, however, serve the insurance companies at this time.[40]

On August 15, 2006, Shaw (Cytosol) wrote a letter to Boon (Federal) stating, "It is Cytosol's position that Chubb's conduct is not only a breach of the . . . insurance policies but a violation of the Massachusetts Unfair Trade Practices Act, Mass. G.L. c. 93A." [41] Shaw alerted Chubb of the complaint that was filed in Massachusetts Superior Court, and also enclosed

a draft press release that details Chubb's denial of coverage despite the

30. *Id.* at 267–269.

31. *See id.* at 264–269.

32. *See id.* at 3–4.

33. *See* JA Ex. 13 at 270 [# 18–16].

34. *See* Pl. Mem. at 5; Broadley Aff. at 5[# 21].

35. *See* JA Ex. 14 [# 18–17].

36. *See* JA Ex. 15 [# 18–18].

37. *Id.* at 284.

38. *See id.* at 285–291.

39. *See* JA Ex. 17 [# 18–20].

40. *See id.*

41. *Id.*

general liability coverage purchased by Cytosol to cover claims of defective products, which are the exact claims asserted by AMO. The press release also describes Chubb's failure to investigate the claims prior to the denial of coverage, and its failure to at the minimum provide coverage under a reservation of rights.[42]

Shaw concluded the letter as follows:

Cytosol strongly urges Chubb to revisit the facts as described in the Complaint and to reconsider its denial of coverage, especially its failure to tender a defense under a reservation of rights. If Chubb continues to deny coverage, Cytosol will have no choice but to serve Chubb with the Complaint and to issue the press release. Cytosol will be taking both of these actions by August 23, 2006, unless Chubb has altered its position.[43]

Chubb retained the law firm Morrison Mahoney to serve as coverage counsel in connection with the Cytosol matter, including attorney William Schneider ("Schneider").[44] On August 31, 2006, Schneider sent Shaw (Cytosol) an eleven-page letter, which contained, among other things, a listing of all of the materials reviewed by the law firm in connection with its coverage evaluation; an overview of the claim; a comprehensive "Coverage Analysis" section; and a set of "Conclusions."[45] Among other things, Schneider concludes:

Based on the foregoing analysis, we concur with the coverage determination made by Federal and conveyed in its June 22, 2006 correspondence. None of the recall-related damages AMO allegedly incurred in connection with the recall of its products containing Cytosol manufactured Balanced Salt Solution fall within the terms of coverage under either Federal Policy Number 3578–71–83 ROC or Federal Policy Number 33582–68–80 ROC. Rather, those damages are excluded from coverage by the clear terms of the policies.[46]

On October 4, 2006, Shaw (Cytosol) wrote a letter to Boon (Federal) and Schneider (Federal's Counsel), demanding that Federal defend and indemnify Cytosol for AMO's claims under the D & O liability policy, stating, "Based on the express language of the [D & O] policy, there should be no question that Chubb is obligated to defend and indemnify Cytosol for the claim for damages made by AMO."[47]

On October 25, 2006, in a three-page letter from Brooke Joiner, a Chubb claims attorney, to Shaw (Cytosol), Chubb denied this subsequent request for coverage under the D & O Policy.[48] Joiner noted, "Based on the information submitted, it appears that an Insured Organization Claim has been made against an Insured Organization for Wrongful Act."[49] Specific policy exclusions, however, operated to bar coverage.[50]

On November 24, 2006, Federal removed the Massachusetts state action to this court.[51]

---

42. *Id.*

43. *Id.*

44. *See* JA Ex. 18 [# 18–21].

45. *See id.*

46. *Id.* at 314.

47. *See* JA Ex. 20 [# 18–23].

48. *See* JA Ex. 21 [# 18–24].

49. *See id.* at 323.

50. *See id.* at 323–324.

51. *See* Notice of Removal [# 1].

### D. Tolling Agreement between Cytosol and AMO

AMO has indicated clearly to Cytosol that it stands ready to sue Cytosol to recover the damages asserted in AMO's April 26, 2006 demand letter.[52] AMO agreed, however, in a written tolling agreement on the statute of limitations and subsequent extensions thereof, to defer filing suit pending the outcome of the insurance coverage litigation in this court.[53]

### E. Payment Under the Products Withdrawal and Crisis Management Insurance

As noted, Cytosol obtained Products Withdrawal and Crisis Management Insurance as a supplement to the Products and General Liability policies. Under this insurance, Cytosol submitted a claim on its own behalf for expenses related to the Class 1 Recall.[54] Federal paid Cytosol the coverage limit of $25,000 in connection with these costs submitted directly by Cytosol.[55] Accordingly, this coverage is not at issue in this case.

### F. Cytosol's Suit and Federal's Counterclaim

Cytosol advances two counts in the Amended Complaint. In Count I, Cytosol seeks a declaratory judgment that Federal "must provide indemnity and a defense and/or defense costs for AMO's claims against Cytosol."[56] Cytosol also seeks legal fees in prosecuting the declaratory judgment action.[57] In Count II, Cytosol alleges that Federal violated Massachusetts General Laws chapter 93A by denying coverage "instead of investigating the nature of the AMO claims and providing coverage under a reservation of rights."[58] Cytosol seeks treble damages, costs and attorneys fees on this count.[59]

Federal advances a counterclaim, seeking a declaratory judgment that (1) the various insurance policies do not provide coverage;[60] (2) Federal has no duty to defend Cytosol for any damages related to the recall; and (3) Federal has no duty to indemnify Cytosol for any claims seeking damages related to the recall.[61] Federal also seeks the costs of prosecuting the counterclaim and attorneys fees.[62]

## Discussion

### A. Legal Standard for Summary Judgment

A court may grant summary judgment when the moving party has shown "that there is no genuine issue as to any materi-

---

**52.** *See, e.g.,* Letter from Janet M. Richardson, AMO, to Paul Shaw, Brown Rudnick Berlack Israels LLP, Mar. 23, 2007 [# 20–1].

**53.** *See* Plaintiff's Reply to Federal Insurance Company's Opposition to Plaintiff's Motion for Summary Judgment at 8 [# 37]. The court has one of these agreements in the record. *See id.*

**54.** *See* Def. Facts at 10. Cytosol does not dispute this fact. *See* Pl. Response to Def.'s Local Rule 56.1 Statement at 4 [# 32].

**55.** *See id.* Cytosol does not dispute this fact. *See* Pl. Response to Def.'s Local Rule 56.1 Statement at 4 [# 32].

**56.** Amended Compl. at 5.

**57.** *Id.* at 6.

**58.** *Id.*

**59.** *See id.*

**60.** As noted above, Federal acknowledges coverage and has paid Cytosol under the Products Withdrawal and Crisis Management Insurance policy, so this policy is excepted from the declaratory judgment request.

**61.** *See* Def.'s Answer, Jury Demand and Counterclaims 10–19 [# 3].

**62.** *See id.* at 20.

al fact and that the moving party is entitled to a judgment as a matter of law."[63] The court must examine the facts in the light most favorable to the non-moving party, resolving any reasonable inference in that party's favor.[64] Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.[65]

### B. Note on the Ripeness of the Issues for Adjudication

██ Federal asserts that the court's consideration of this matter is premature, because AMO did not file suit against Cytosol. In Massachusetts, however, the filing of a formal lawsuit is not always required to trigger a duty to defend.[66] " '[W]here an insured's failure to respond adequately to a pre-suit letter would significantly affect the insured's ability to defend itself in a subsequent action arising out of the same subject matter and is 'substantially equivalent to the commencement of a lawsuit,' the letter may be sufficient to invoke the insurer's defense obligations to the insured."[67]

Here, although not a formal lawsuit, AMO's adversarial demand letter suffices to trigger a duty to defend. Cytosol's failure to respond adequately to the letter would significantly affect its ability to defend itself in a subsequent action involving these same issues. In addition, AMO stands ready to file suit, and the only reason AMO has not sued Cytosol is because of a tolling agreement between AMO and Cytosol. Accordingly, a duty to defend is triggered, and this court has jurisdiction to consider this dispute.

### C. Declaratory Judgment

There is no genuine issue of material fact as to the declaratory judgments sought by each side, because the relevant inquiry solely involves the terms of the insurance policies. Consequently, this is a question of law for the court to resolve,[68] and Federal prevails as matter of law.

### D. The General Liability Policy, No. 3578–71–83, Does Not Provide Coverage

██ The Customarq General Liability Policy specifically "does not apply to **bodily injury** or **property damage** included within the **products-completed operations hazard**."[69] The "products-completed operations hazard" includes

63. Fed.R.Civ.P. 56(c).

64. *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002).

65. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

66. *See, e.g., Liberty Mut. Ins. Co. v. Black & Decker Corp.,* 2005 WL 102964, at *4, 2005 U.S. Dist. LEXIS 659, at *10 (D.Mass. Jan. 13, 2005).

67. *Zecco, Inc. v. Travelers,* 938 F.Supp. 65, 67 (D.Mass.1996) (*quoting Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 555 N.E.2d 576, 581 (1990)).

68. *See, e.g., Chenard v. Commerce Ins. Co.,* 440 Mass. 444, 799 N.E.2d 108, 110 (2003)

("The interpretation of an insurance policy is a question of law...."); *Ruggerio Ambulance Serv. v. National Grange Ins. Co.,* 430 Mass. 794, 724 N.E.2d 295, 298 (2000) ("The responsibility of construing the language of an insurance contract is a question of law for the trial judge....").

69. JA Ex. 1 at 88 (emphasis in original). On each page of the "Definitions" section of the policy, the policy reads at the top, "WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT, WORDS AND PHRASES THAT APPEAR IN BOLD PRINT HAVE THE SPECIAL MEANING DESCRIBED BELOW." *See, e.g., id.* at 60, 61, 62, 63 (emphasis in original).

all **bodily injury** and **property damage** taking place away from premises owned or occupied by . . . you and arising out of **your product** or **your work,** except:

1. products that are still in your physical possession;

2. work that has not yet been completed or abandoned.[70]

"Your product"

A. means any . . . goods or products (other than real property), including:

a. **information and network technology products; and**

b. **life science products;**

manufactured, sold, handled, distributed or disposed of by:

- you;

- others trading under your name; or

- a person or organization whose assets or businesses you have acquired

. . .

B. includes . . .

1. representations or warranties made at any time with respect to the durability, fitness, performance, quality or use of **your product**. . . .

2. the providing of or failure to provide warnings or instructions.[71]

Here, Cytosol's Endosol solution clearly falls within the expansive definition of "your product" as outlined in the policy. In addition, all of AMO's asserted damages resulting from Cytosol's product took place "away from premises owned or occupied by Cytosol," e.g., in hospitals and doctors' offices. Accordingly, the products-com-

pleted operations hazard bars coverage under this policy.

### E. The Products Policy, No. 33582–68–80, Does Not Provide Coverage

 Another Customarq policy provided liability coverage for products-completed operations that were *not* covered under the General Liability Policy. The Products Policy provided coverage for

damages that the insured becomes legally obligated to pay by reason of liability:

1. imposed by law; or

2. assumed in an **insured contract;**

for **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies.[72]

The coverage, however, applied "only to such **bodily injury** or **property damage** included in the **products-completed operations hazard[,]**" and operated on a "claims-made" basis.[73]

### 1. AMO's Indemnification Request

As mentioned above, in addition to the $661,913.66 in claimed damages arising from the allegedly contaminated Endosol, AMO also requested that Cytosol reimburse it for $97,384.89 in indemnification and associated costs for third-party customer claims against AMO.

There is, however, no live controversy here. As noted by Federal, "Federal has never denied coverage for any covered third-party claim seeking to recover for bodily injury or property damage against Cytosol, or AMO for that matter." [74] Federal notes, "In fact, Federal is presently defending Cytosol and AMO in connection with certain third-party claims covered un-

---

70. *Id.* at 61–62 (emphasis in original).

71. *Id.* at 62–63 (emphasis in original).

72. JA Ex. 2 at 115 (emphasis in original).

73. *Id.* (emphasis in original); Def. Facts at 6.

74. Def.'s Opp. to Pl.'s Mot. for Summ. J. at 18[# 29] ("Def.Opp.").

der Policy No. 35826880 [(the Products Policy)], and to date has paid $426,981.42 to settle third party claims."[75]

Cytosol presents no evidence to contradict these statements, nor is there any evidence in the record to the contrary. Accordingly, this court finds that no controversy exists with respect to the $97,384.89 in indemnification claims. Federal is already defending against these third-party claims, thereby rendering declaratory relief inapplicable. For purposes of this summary judgment analysis, therefore, this court considers the $661,913.66 in damages claimed by AMO as a result of the allegedly contaminated Endosol as the operative claim.

### 2. AMO's Damages Demand

Several explicit exclusions in the Products Policy independently bar coverage for AMO's claims.

### i. The Injury to Products Exclusion

■ The injury to products provision excludes coverage for **"property damage to your product** arising out of it or any part of it."[76] This type of "business risk" exclusion is "designed to exclude from coverage the ordinary contractual risk that a product will fail to live up to contract demands and will require repair or replacement."[77]

In *Commerce Ins. Co. v. Betty Caplette Builders,*[78] the Massachusetts Supreme Judicial Court affirmed that the injury to products provision exclusion precluded insurance coverage for these types of "business risk" claims, and quoted Professor

Long's treatise for the majority view on liability policies:

> [The injury to products or work] exclusion is meant to deny coverage in situations where the insured or its subcontractor has caused damage to the product, work, property or structure. The purpose of the exclusion is to prevent the insured from using its product liability coverage as a form of property insurance to cover the cost of repairing or replacing its own defective products or work.
>
> . . .
>
> The injury to products or work exclusion is intended to exclude insurance for damage to the insured's product or work, but not for damage caused by the insured's product or work. Thus, the exclusion does not apply where the product or work causes damages to other persons or property. In such a situation, while there would not be coverage for damage to the work or product itself, damages caused by the product to other work or products would be covered.
>
> . . .
>
> The injury to work or products exclusion is consistent with the goal of the CGL, which is to protect the insured from the claims of injury or damage to others, but not to insure against economic loss sustained by the insured due to repairing or replacing its own defective work or products. . . .[79]

In *Caplette*, the underlying claims were for deficiencies in the houses built by Betty Caplette Builders ("Caplette"). Apply-

---

75. *Id.* at 18–19.

76. JA Ex. 2 at 127 (emphasis in original).

77. *American Home Assurance Co. v. Libbey–Owens–Ford,* 786 F.2d 22, 28 (1st Cir.1986) (citing, inter alia, *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 791 (1979)).

78. 420 Mass. 87, 647 N.E.2d 1211 (1995). Both Parties agree that *Caplette* is the seminal Massachusetts case in this area. *See, e.g.,* Pl.'s Opp. to Def.'s Mot. for Summ. J at 8[# 30] ("Pl.Opp.").

79. *Id.* at 1213–1214.

ing the injury to products exclusion, the court explained:

> When Caplette constructed houses, Caplette assumed the risk of failing to construct in a workmanlike manner and to provide an acceptable end product. The consequence of not performing properly is a part of every business enterprise. Repairing or replacing faulty products is a business expense, ordinarily to be borne by the insured contractor in order to satisfy customers.... In the instant case, Caplette could have purchased a builder's risk insurance or a performance bond to protect Caplette against damage to its product.... Instead, Caplette purchased comprehensive general liability insurance which insures against another form of risk in the insured-contractor's line of work, i.e., injury to people and damage to other property caused by a faulty product or work.[80]

Here, the injury to products exclusion bars all of AMO's damages claims.[81] First, because Cytosol manufactured and provided the Endosol to AMO, Endosol is clearly Cytosol's product. Second, Cytosol, the insured, allegedly produced a defective and damaged product as a result of faulty manufacturing or quality control in the production of Endosol.

Lastly, among other things, AMO seeks damages to compensate for the defective Endosol: $250,000 for "the cost to AMO of Product which was in the warehouse at the time of the recall and thus could not be sold[,]" and $191,547.27 to pay for the damaged product returned by customers pursuant to the recall.[82] Additionally, AMO seeks damages of $118,071 in cover costs—the costs of replacing the defective Endosol.[83] The injury to products exclusion applies to bar precisely these type of economic loss damages caused by faulty performance on the part of the manufacturer. As in *Caplette*, addressing and replacing defective products is a business expense, which should "be borne by the insured contractor in order to satisfy customers."[84] As noted in *Caplette*, while barring claims for damage *to* the product itself, the injury to products exclusion does not preclude coverage for "damage caused *by* the insured's product or work."[85] This exclusion, therefore, does not preclude coverage for claims based on damages caused by the Endosol, such as bodily injury to a third party. As noted above, however, Federal is already defending Cytosol and AMO against these types of third-party claims, and these claims fail to present a live controversy for this court.

### ii. The Impaired Property Exclusion

■ Federal also denied coverage based on another "business risk" exclusion. The Impaired Property exclusion excludes coverage for

> **property damage** to ... **impaired property**; or ... property that has not been physically injured ... arising out of any ... defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or ... delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms and conditions.[86]

---

80. *Id.* at 1214.

81. *Cytosol* concedes that this exclusion "might ultimately preclude coverage for some of AMO's claims." Pl. Opp. at 8 (emphasis in original).

82. *See* JA Ex. 12 at 268.

83. *See id.*

84. *Caplette,* 647 N.E.2d at 1214.

85. *Id.* at 1213 (emphasis added).

86. JA Ex. 2 at 127 (emphasis in original).

In turn, "Impaired Property" is defined as:

tangible property, other than **your product** or **your work,** that cannot be used or is less useful because:

- it incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or

- you have failed to fulfill the terms or conditions of a contract or agreement; if such property can be restored to use by:

- the repair, replacement, adjustment or removal of **your product** or **your work;** or

- you fulfilling the terms or conditions of the contract or agreement.[87]

In *Dorchester Mut. Fire Ins. Co. v. First Kostas Corp.*, the Massachusetts Appeals Court addressed an exclusion nearly identical to the one here, and held,

[T]he effect of the "impaired property" exclusion is to bar coverage for loss of use claims (1) when the loss was caused by the insured's faulty workmanship; and (2) when there has been no injury to the property aside from the incorporation of the insured's faulty work itself.[88]

The court also noted that several cases in this area "have turned on the fact that the exclusion applies only if the damaged property can be restored to use by the 'repair, replacement, adjustment or removal' of the insured's work."[89]

Here, AMO's product, AMO Endosol, is tangible property that cannot be used because it incorporates Cytosol's Endosol—the insured's product that is "known or thought to be defective, deficient, inadequate or dangerous."[90] Moreover, AMO suffered no additional injury other than the incorporation of Cytosol's Endosol (the insured's faulty product) into its own product (AMO Endosol). Lastly, by replacing the Cytosol Endosol (in the AMO Endosol box) with safe balanced saline solution, the AMO product can be restored. Accordingly, the impaired property exception also applies to bar coverage.

### iii. The Recall Exclusion

█ The "Recall of Products, Work or Impaired Property" exclusion, another business risk exclusion, also applies to bar coverage for all recall-related expenses. The recall exclusion precludes coverage for

any damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement adjustment, removal or disposal of:

- **your product;**

- **your work; or**

- **impaired property;**

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected

---

87. *Id.* at 145.

88. 49 Mass.App.Ct. 651, 731 N.E.2d 569, 572 (2000).

89. *Id.*

90. The fact that the product sold as AMO Endosol wholly incorporates Cytosol's Endosol does not change the fact that the AMO product incorporates Cytosol's product. It also, despite Cytosol's argument to the contrary, does not change the analysis here. *See, e.g., Atlantic Mut. Ins. Co. v. Hillside Bottling Co., Inc.,* 387 N.J.Super. 224, 903 A.2d 513 (App.Div.2006) (holding that a manufacturer, which produced soft drinks for other companies and manufactured a contaminated batch of beverages, had no duty to defend or indemnify—other than payment under a limited product recall provision—because of business risk exclusions in its liability policies).

defect, deficiency, inadequacy or dangerous condition in it.[91]

Here, three different organizations were involved with the recall or withdrawal of Endosol. On November 18, 2005, in an "Urgent Medical Device Recall," AMO recalled all Endosol manufactured by Cytosol. On February 10, 2006, the FDA requested that Cytosol recall the Balanced Salt Solutions, and on February 14, 2006, Cytosol initiated a Class 1 Recall for all lot numbers of the saline solution in its Braintree facility.

As a result of the recall, AMO seeks $102,295 in damages for the "costs associated with effectuating and managing recall." [92] Because all of these costs are related to the recall of the "impaired property"—the AMO Endosol that incorporated saline solution manufactured and supplied by Cytosol—the recall exclusion bars coverage.

In addition, separate recall-specific insurance purchased by Cytosol adds further support to the interpretation that the insurance policies at issue here do *not* provide coverage for recall-related expenses. As noted above, Cytosol obtained "Products Withdrawal and Crisis Management Insurance" to supplement its liability policies, and, under this recall insurance policy, Federal paid the coverage limit to Cytosol for the costs associated with the Class 1 Recall.

### F. The D & O Policy, No. 8169–0527, Does Not Provide Coverage

■ The D & O policy also does not provide coverage for AMO's claims. Plaintiff asserts that it is entitled to coverage under the additional Corporate Liability Coverage provision of its D & O Policy. This provides,

> If the Corporate Liability Coverage is purchased ..., the Company shall pay **Loss** on behalf on the **Insured Organization** resulting from any **Insured Organization Claim** first made against such **Insured Organization** during the **Policy Period** ... for **Wrongful Acts**.[93]

The policy defines "Loss" as

> the total amount which any **Insured** becomes legally obligated to pay as a result of any **Claim** made against any **Insured** for **Wrongful Acts**, including, but not limited to, damages ..., judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**.[94]

"Wrongful Act" means "any error, misstatement, misleading statement, act, omission, neglect, or beach of duty committed, attempted, or allegedly committed or attempted by ... any **Insured Organization**."[95]

D & O insurance typically covers directors and officers of a corporation for claims of wrongdoing in connection with the corporation's business. Consequently, it is somewhat difficult to reconcile Cytosol's claims here with the fundamental purpose of such policies. Even assuming, however, that this provision of the D & O provision may provide coverage,[96] a major

---

91. JA Ex. 2 at 131–132 (emphasis in original).

92. *See* JA Ex. 12 at 267 (capitalization modified).

93. JA Ex. 3 at 214 (emphasis in original).

94. *Id.* at 216 (emphasis in original).

95. *Id.* at 217–218 (emphasis in original).

96. Federal appears to have initially conceded this point, despite its summary judgment brief. *See* JA Ex 21 ("Based on the information submitted, it appears that an Insured Organization Claim has been made against an Insured Organization for Wrongful Act.").

exclusion operates independently to bar coverage.[97]

Significantly, Exclusion III(A)(4) to the D & O Policy reads as follows:

No coverage will be available under this Coverage Section for any **Claim** against an **Insured:**

4. for bodily injury, mental anguish, emotional distress, sickness, disease or death of any person *or damage to or destruction of any tangible property including the loss of use thereof whether or not it is damaged or destroyed....* [98]

Here, this broad exclusion precludes all of AMO's claims under the D & O Policy. The Endosol solution is tangible property that allegedly has a high level of dangerous endotoxins. As a result, the solution is damaged and cannot be used, and AMO seeks to recover for these damages.[99]

Cytosol's arguments against application of the exclusion are unavailing. First, Cytosol argues that the exclusion does not apply to Insuring Clause C, the relevant clause in this matter. Cytosol argues that, at best, whether the exclusion applies is ambiguous and should be construed against the drafter. To the contrary, however, the tangible property exclusion appears in the "Exclusions" section of the policy. Moreover, these exclusions plainly appear to apply to the whole D & O policy.

Second, Cytosol notes that this is the first time Federal has advanced this exclusion as a basis for denying coverage. While this may or may not be the case, the exclusion is valid. This court will not speculate why Federal did not advance this as a basis earlier.

Third, Cytosol argues that even if the exclusion applied, it would not negate Defendant's duty to defend Plaintiff against AMO's claims. Cytosol argues that most of AMO's claims do not fall within the exclusion's "very narrow definition of damage to, destruction or loss of use of Endosol." This argument also fails. The policy does not appear to define "damage to," "destruction" or "loss of use." A plain language read of these terms, however, leaves no doubt that the Endosol was defective and damaged (as a result of the high endotoxin levels), and could not be used for its intended purpose.

### G. Cytosol's Claim Under Massachusetts General Laws Chapter 93A

Under Massachusetts General Laws ("M.G.L.") chapter 93A, § 2, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." [100] In addition, under M.G.L. c. 176D, § 3(9)(d), an insurer must conduct a reasonable investigation before denying a claim.[101] A violation of this

---

97. Federal asserts an additional exclusion—the contract liability exclusion. An evaluation of this exclusion, however, requires an analysis of the corporate structures of Cytosol Laboratories and Cytosol Opthalmics, as well as additional information on the relationship between the two entities. The record on this issue is limited, at best. Moreover, because another exclusion applies to bar coverage completely under the D & O Policy, an evaluation of this additional exclusion is unnecessary to the outcome in this case. As such, this court declines to conduct this analysis.

98. JA Ex. 3 at 218 (bold in original, italics added).

99. Moreover, this provision also bars coverage under the D & O policy for any bodily injury or property damage.

100. M.G.L. c. 93A, § 2. Section 11 of 93A gives an individual harmed by an unfair trade practice a cause of action. *See id.* at § 11.

101. M.G.L. c. 176D § 3(9)(d) ("An unfair claim settlement practice shall consist of any of the following acts or omissions: ... (d) Refusing to pay claims without conducting a

subsection is evidence of an unfair business practice under 93A.[102]

■ Here, even when viewing the evidence in a light most favorable to the Cytosol, Cytosol's 93A claim is insufficient as a matter of law. There is no evidence that Federal failed to investigate appropriately before making a coverage decision, or that a reasonable insurer would have conducted any additional investigation. Federal reviewed AMO's letter, Cytosol's communications and the relevant insurance policies before denying coverage. As noted by Federal, this is the "very same information Cytosol claims establishes coverage."[103] As also noted by Federal, "Cytosol has not identified any document, allegation, fact or circumstance [that] Federal failed or refused to consider in its investigation."[104]

Moreover, on several occasions, Federal requested that Cytosol submit any additional information relevant to the coverage decision. For example, in Boon's (Federal) June 22, 2006 letter to Broadley (Cytosol), she concludes the letter as follows:

> If you believe that there is additional information which has a bearing on Federal's coverage determination in this matter, please immediately forward that information to the undersigned. If you have any questions, please do not hesitate to call.[105]

Additionally, in Schneider's (Morrison Mahoney, on behalf of Federal) August 31, 2006 letter to Shaw (Brown Rudnick, on behalf of Cytosol), Schneider states, "[T]o the extent Cytosol continues to disagree with Federal's coverage position, we request that it provide a statement of its position with reference to relevant facts and legal authorities."[106]

Furthermore, there is no evidence of bad faith. In addition to informal communications with Cytosol, Federal issued two comprehensive explanations of its coverage denial with respect to the liability policies. Additionally, after being asked by Cytosol to consider the D & O policy as a source of coverage, Federal sent a letter explaining why there was no coverage under that policy as well. Moreover, Federal (via its parent company) retained an outside law firm to evaluate the coverage decision. After an independent analysis, the law firm concurred with Federal's position and provided an additional comprehensive explanation of the denial to Cytosol. Lastly, and from a substantive perspective, Federal denied coverage based on a reasonable interpretation of its policies, and this court agrees with Federal's interpretation.

Accordingly, Federal's conduct, as a matter of law, does not warrant the imposition of 93A liability.

## Conclusion

For reasons stated above, various exclusions in the relevant insurance policies preclude coverage for all of AMO's claims, and Cytosol's 93A claim fails as a matter of law. Accordingly, Federal's *Motion for*

---

reasonable investigation based upon all available information;").

**102.** *See Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 610 N.E.2d 912, 917 (1993). *See also Fed. Ins. Co. v. HPSC, Inc.,* 480 F.3d 26, 35 (1st Cir.2007) ("The Massachusetts Supreme Judicial Court has concluded that a violation of General Laws chapter 176D, § 3, which defines unfair claim settlement practices in the insurance industry, is evidence of an unfair business practice under chapter

93A, § 2, which would give rise to a cause of action under chapter 93A, § 11.").

**103.** Def. Opp. at 19.

**104.** D. Mem. at 19. *See also* Def. Opp. at 19.

**105.** JA Ex. 15 at 291.

**106.** JA Ex. 18 at 316.

*Summary Judgment* [# 22] is ALLOWED as to all counts of Cytosol's Complaint and Federal's Counterclaims for declaratory relief, Cytosol's *Motion for Summary Judgment* [# 17] is DENIED. Each side, however, shall bear its own costs and attorneys fees.[107]

An Order has issued.

### ORDER

For the reasons in the accompanying Memorandum, this court hereby orders that:

1. Defendant's *Motion for Summary Judgment* [# 22] is ALLOWED as to all counts of Plaintiff's Complaint and Defendant's Counterclaims for declaratory relief, and DENIED as to Defendant's request for costs and attorneys fees.

2. Plaintiff's *Motion for Summary Judgment* [# 17] is DENIED.

IT IS SO ORDERED.

---

107. Accordingly, Federal's request for the costs of prosecuting its counterclaim and attorneys fees is DENIED.